# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JAMES PERRY,

 Plaintiff,

vs.        No. 18-CV-00539-TCK-FHM

SAFECO INSURANCE COMPANY OF
AMERICA,

 Defendant.


VIDEOTAPE DEPOSITION OF JAMES ROBERT PERRY, JR.
Taken on Behalf of the Defendant
On March 29, 2019, beginning at 9:42 a.m.
In Tulsa, Oklahoma

APPEARANCES:

Appearing on behalf of the PLAINTIFF

 Brandy L. Wandres
 WANDRES LAW, P.C.
 4835 South Peoria Avenue
 Tulsa, Oklahoma 74105
 918-641-4044
 Brandy@wandreslaw.com

Appearing on behalf of the DEFENDANT

 William W. O'Connor
 HALL ESTILL
 320 South Boston Avenue, Suite 200
 Tulsa, Oklahoma 74103-3706
 (918) 594-0588
 Boconnor@hallestill.com

Job No. CS3261743

Videographer:  Mark Von Lanken

Reported By:  Becky C. Dame, CSR, RPR

(Exhibit 2 marked for identification)

BY MR. O'CONNOR:

Q    Let me have you look at what's been marked as Exhibit 2.  This is your automobile insurance policy.  Have you read this?

A    I don't think so, no.

Q    Have you ever read the policy?

A    Not that I recall.

Q    You understand that an insurance policy is a contract; right?

A    Yes.

Q    And that it confers duties and obligations on you as the insured and on the insurance company as well; correct?

A    Correct.

Q    Let me have you look at what's marked Safeco 5 at the bottom.

A    The bottom of the first page?

Q    Do you see the numbering on the very bottom right-hand corner?  It says "Safeco" with some numbers?

A    Yeah.  Right here (Indicating).

Q    Yeah.  So if you'll turn to page 5.  Do you see at the top that it identifies you and your wife as the named insureds?

could recover is stated right there for any kind of UM coverage?

A    Yes.

Q    And do you know what uninsured or underinsured motorist coverage is?

A    Well, I presume that is somebody that doesn't -- hits me and doesn't have insurance, they'll cover that.

Q    Okay.  Look at page 17.  Near the bottom of the page, do you see where it says "Part C, Uninsured motorist coverage"?

A    Yes.

Q    And under A, it says, "We will pay damages which an insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by that accident and caused by an accident."

Did I read that accurately?

A    Yes.

Q    And the owner's or operator's liability for these damages must arise out of the ownership, maintenance, or use of the uninsured motor vehicle; correct?

A    Correct.

Q    On the next page 18, under paragraph C,

Page 38

which is at the top of the page, it says "Uninsured motor vehicle means a land motor vehicle or trailer of any type:  1, to which no bodily injury, liability, bond, or policy applies at the time of the accident; 2, to which a bodily injury liability bond or policy applies at the time of the accident but its limit for bodily injury liability is less than the amount of the claim of the person or persons making such claim, regardless of the amount of coverage of either of the parties in relation to each other."

        Did I read that correctly?

A    You did.

Q    You understand, then, that under the policy, uninsured or underinsured benefits only apply to injuries caused by an accident; correct?

A    Yes.

Q    And if a person had injuries that were not caused by the specific motor vehicle accident at issue, those injuries would not be covered under underinsured motorist coverage; correct?

A    Correct.

Q    Have you received underinsured motorist benefits or uninsured motorist benefits from any other policy for this loss?

Page 40

Global Health?

A    I believe so, yes.  It may have been Community Care.

Q    And I think we've covered this a minute ago, but you understand that the insured, which is you, have certain obligations under the contract; right?

A    Uh-huh -- yes.

Q    Under the policy of insurance?

A    (Witness nods head up and down)

Q    And that you must comply with those terms, just like the insurance company has terms under the contract that it must comply with; right?

A    Right.

Q    Let me have you look at page 25 of Exhibit 2.

A    25?

Q    25.

A    I don't see a 25.

Q    Look at Safeco 25 at the bottom.

A    Okay.  Okay.

Q    You see where it says "Part E - Duties After an accident or Loss"?

A    Yes.

Q    And it reads:  "We have no duty to provide

Page 41

coverage under this policy unless there has been full compliance with the following duties:  A, we must be notified promptly of how, when, and where the accident or loss happened.  Notice should also include the names and addresses of any injured persons and of any witnesses."

Did I read that accurately?

A    Yes.

Q    "B, a person seeking any coverage must: 1, cooperate with us in the investigation, settlement, or defense of any claim or suit; 2, promptly send us copies of any notices or legal papers received in connection with the accident or loss; 3, submit as often as we reasonably require: a, to physical examinations by physicians we select.  We will pay for these exams; b, to examination under oath and subscribe the same.  We may examine any insured separately and apart from the presence of any other insured."

Did I read that accurately?

A    Yes.

Q    "4, authorize us to obtain:  A, medical reports; and, B, other pertinent records; and 5, submit a proof of loss under oath if requested when required by us."

Page 42

Was that accurately read?

A    It was.

Q    So you would acknowledge and agree that you had a duty to promptly notify Safeco of the accident and the loss; right?

A    Yes.

Q    And a duty to cooperate with Safeco's investigation; correct?

A    Correct.

Q    A duty to submit to physical exams; right?

A    Correct.

Q    A duty to provide Safeco with documentation of all losses; right?

A    Yes.

Q    A duty to provide medical bills; correct?

A    Yes.

Q    And a duty to provide medical authorizations; right?

A    Right.

Q    Before and after this automobile or UM or UIM claim -- and when I say "UIM claim," I'm saying underinsured motorist.  Okay?

A    Yes.

Q    Have you ever made any other claims on insurance, whether it's home -- let's start with

Page 46

A   No.

Q   How about any on-the-job accidents?  And I'm excluding the two workers' comp issues.

A   That were reported?  There's plenty of injuries, yes.

Q   What are those?

A   One was to my neck.

Q   How did that happen?

A   I was -- when I worked at the coal-fired plant, at the bottom of the boiler, we had a process where we had a heavy metal bar, long, and we rested it on the door and would break up the slag that had fallen down that wouldn't continue through with this bar through shock, so you're actually jamming it into it, and it ruptured a disc in my neck.

Q   And did you seek treatment?

A   Yes.  Yes.  I was in pain.

Q   Who was your treating physician for that?

A   I have no idea.

Q   In Pryor?

A   It was in Tulsa.

Q   In Tulsa?  And when was that?

A   I think it was 2006.

Q   Okay.  Did you file a workers' compensation claim?

Page 54

In the meantime, my wife was trying to call 911, and she got through to 911, and her phone went dead. And I went to check my phone, and it was dead. We had just spent some time at a doctor's office for her, and we used up all our power waiting at the doctor's office.

And we exchanged information. And as we left, my wife said she was a little sore in her neck area, and we discussed my hand being a little sore and my neck area and shoulder.

And we had seen a police officer pulled over on the side of the road, and we stopped and asked him and told him what had happened, because we weren't able to reach anybody.

And he had told us that, regardless, we wouldn't have been able to -- they wouldn't have been able to do anything anyway because it was -- unless it was an injury accident because of slick streets, so we just continued on.

Q    You told the policeman there were no injuries?

A    Yes.

Q    Tell me about the weather when this happened.

A    It was sort of like it was this morning.

Page 55

It was raining and dark, and it was in February.

Q    What vehicle were you driving?

A    2004 Ford Land Cruiser.

Q    And do you still have the car?

A    Yes.

Q    What other cars do you have?

A    2009 VW.

Q    VW what?

A    Jetta wagon.

Q    Your vehicle was not damaged; correct?

A    Didn't appear to be, no.

Q    And this occurred on February 23 of 2016?

A    Yes.  I'm not sure about the exact date, but it was February 2016.

MR. O'CONNOR:  Why don't we take a break?

THE VIDEOGRAPHER:  We are off the record. The time is 10:42.

(Off the record)

THE VIDEOGRAPHER:  We are on the record. The time is 10:57.

BY MR. O'CONNOR:

Q    This accident that's at issue here was caused by the driver, Gerald Koch; correct?

A    I believe that's his name, yes.

Q    Did you know Mr. Koch prior to the

Page 56

accident?

A    No, I did not.

Q    You said you checked on him after the accident.  He was -- what did you say.  He was stunned?

A    Yeah.  It looked like he was in shock.  He just was looking forward and --

Q    Did he drive away?

A    Yes.

Q    Did he have damage to his vehicle?

A    Yes.

Q    And was he injured?

A    I couldn't tell you that.

Q    Did you ever get any claim from him regarding his injuries or the physical damage to his vehicle?

A    No.

Q    After checking on him immediately after the accident, did you ever talk to him again?

A    No, I did not.

Q    Did he have insurance?

A    Yeah -- same insurance that I have.  Same company.

Q    Same company?

A    Correct.

Q    Do you do any kind of farm --

A    For own self?

Q    Yes.

A    Yes.  Eggs.

Q    Eggs?

A    Yes.

Q    How about guineas?

A    Entertainment.

Q    Cats?

A    Entertainment.

Q    Did you seek any medical treatment for your neck from the accident?

A    Yes.

Q    What was that?

A    When was that?

Q    What?

A    The doctor?

Q    Yeah.

A    It's hard to pronounce his name. Thambuswamy or something like that.

Q    Where was he?

A    In Tulsa.

Q    Where?

A    I can't tell you.  Don't know.

Q    What was the nature of the treatment for

Page 59

your neck?

A    I think it was a CT scan or MRI.  I'm not sure of the two.

Q    And was there a diagnosis?

A    Yes.  Exactly what it was, I would have to read the report, but degenerative stuff and -- I just can't say for sure.

Q    Anything beyond degenerative stuff?

A    I can't say for sure.

Q    Okay.  How about -- did you take some medication as a result of --

A    No.  No.

Q    How about your shoulder?  Did you see the same doctor for your shoulder?

A    I'm not sure I seen anybody specifically for my shoulder.

Q    Okay.  So you never had any diagnosis of your shoulder?

A    No.

Q    As a result of this accident?

A    I've been to so many doctors --

Q    Well, I need to know --

A    I know.

Q    You've sued the company, so I need to know --

Q    Have you advised your employer that you're unable to do certain functions because of your neck?

A    No.

Q    Have you advised your employer that you're unable to do any specific functions because of your shoulder?

A    No.

Q    Have you advised your employer that you're incapable of performing certain functions because of your wrist?

A    No.

Q    You were not transported by ambulance after this accident; right?

A    Right.

Q    Did you drive away?

A    Yes.

Q    And how soon after the accident did you experience pain?

A    Well, it was just soreness in the beginning.  It was a couple of days when the swelling started.  Two or three days before it got so bad that I had to go to the emergency room.  It swelled up.

Q    And was that in your wrist?

A    Yes.

Page 62

Q    The day or evening of the accident, February 23rd, did you seek treatment at the emergency room?

A    No.

Q    Did you seek treatment anywhere that day?

A    No, I did not.

(Exhibit 3 marked for identification)

BY MR. O'CONNOR:

Q    Let me have you look at Exhibit 3.  And these like the other exhibit has numbers at the bottom right-hand corner.  Look at page 343.

MS. WANDRES:  That's a whole bunch of trees here.  My goodness.

MR. O'CONNOR:  Yeah, it is.

MS. WANDRES:  And I'm sorry.  What page did you say?

MR. O'CONNOR:  343.

THE WITNESS:  Okay.

BY MR. O'CONNOR:

Q    This shows you presented to the emergency Hillcrest Hospital in Claremore on February 26 of 2016?

A    Yes.

Q    Do you see that?

A    Yes.

Page 63

Q    And on page 350, you complain of left wrist pain?

A    Yes.

MS. WANDRES:  You can read it, if you want to read.

MR. O'CONNOR:  Yeah.  I'm just looking at --

THE WITNESS:  Well, it says "Prior to arrival."  I assume this is the emergency room.

BY MR. O'CONNOR:

Q    I'm on page 350.  Are you there?

A    Yes.

Q    Okay.  It says "Emergency Department" near the top in Claremore?

A    Yes.

Q    Okay.

A    "Nearest documentation."

Q    And this says February 26th of 2016, so three days later -- or three days beyond the accident?

A    Correct.

Q    And it says "Chief complaint" under -- do you see the heading that says "Triage""?  It's the second heading?

A    Yes.

Page 65

A     Yes.

Q     Let me have you look at page 381.  This is where you presented to Dr. Michael Gietzen at Utica Park Clinic on February 29 of 2016?

A     Yes.

Q     And how did you find Dr. Gietzen?

A     He's my primary physician.  I've had him for a while.

Q     How long?

A     15 years.

Q     And you said you had been complaining of wrist pain three days prior; correct?

A     Before I seen him?

Q     Yeah.  You see it says "Onset:  3 days ago"?

A     Okay.  Yeah.

Q     Is that accurate?

A     I put numbers together.  It was prior to the emergency room visit, I know that.

Q     And it was aching and aggravated by movement?

A     Yes.

Q     And on page 382, he diagnosed you with a sprain; correct?  If you look at the bottom of page 382.  It says "Assessment."  Do you see where

it says "Impression:  Sprain."

A    Yes.

Q    Let me have you look again at page -- not again, but at 386, and this shows that you presented to Dr. Gietzen on March 30th of 2016, at Utica Park Clinic; correct?

A    Yeah.

Q    And you complained of musculoskeletal pain in left hand and numbness; right?

A    Yes.

Q    And he ordered an x-ray of your left wrist and an EMG?

A    Yes.

Q    If you look at page 389.

A    This is at what date?  March 30th, 2 -- okay.

Q    Okay.  Look at page 389.  Do you see where it says "Impression" in the middle of the page?

A    Yes.

Q    And at the top, it says three views of the left wrist taken on March 30 of 2016.

       Do you see that?

A    I'm sorry.  Where at now?

Q    Look at the top of this page 389.

A    Yes.

Page 72

A    I did initially, maybe one or two of the pills, and then stopped.

Q    And why did you stop?

A    I don't like the way they make me feel. Hydrocodone is what I tried to think of earlier -- is what I was taking.

Q    Did you try any other pain medication so that you could sleep?

A    At the time I may have been taking 500 milligrams of Ibuprofen, but since the AFib was discovered, I was told I can't take ibuprofen with Eloquist.

Q    Did you have any other kind of pain medication?

A    No.

Q    And how did it interfere with your daily routine?

A    Quite a bit because of no sleep -- or very little sleep.  I just had a hard time concentrating.

Q    Let me have you look at page 392 to 394. So this indicates you reported to Utica Park Clinic, Dr. Gietzen, on May 12, 2016.

Do you see that?

A    I do.

Q    And you complained of back and neck pain?

Page 73

A    Yes.

Q    And radiating to your left arm?

A    Yes.

Q    And you had an EMG showing severe carpal tunnel in your left arm; right?

A    This says that, yes.  I thought carpal tunnel was in the hand.

Q    Do you see on the History of Present Illness section?

A    The history, yes.

Q    Okay.  It says:  1, back pain"?

A    Yes.

Q    And then it says "Location of pain is neck"?

A    Right.

Q    And then the last line there says, "Discussed EMG showing severe carpal tunnel, left arm as well as C6 left radiculopy -- pathy -- culopathy."

MS. WANDRES:  Radiculopathy.

THE WITNESS:  Yes, I see that.

BY MR. O'CONNOR:

Q    Okay.  Let me have you look at page 884 to 885.

MR. O'CONNOR:  My son's in med school, I

Page 74

need to consult him.

        MS. WANDRES:  Yes.

        THE WITNESS:  I'm sorry.  That wouldn't be good, would it?  I don't know if I can turn it that far.

        MS. WANDRES:  You may have to do some chunks at a time here.

        THE WITNESS:  884?

BY MR. O'CONNOR:

    Q   Yes.  And 885.

    A   Okay.

    Q   This shows you underwent an MRI on your cervical spine on May 26, 2016, at Advantage Diagnostics?

    A   Yes.

    Q   The doctor states that C2-3 is normal; correct?  Do you see down below where it says "C2-3"?

    A   Yes.

    Q   And the doctor notes "Mild degenerative left uncovertebral joint at C3-4"; right?

    A   Yes.

    Q   And at C4-5, she notes "Bilateral mild uncovertebral and facet joint degenerative changes"; right?

Page 80

presented to Dr. Chalkin at the Orthopedic Center; correct?

A    Correct.

Q    And you returned after having a severe carpal tunnel syndrome.  Do you see in the Chief Complaint?

A    Yes.  I see that.  I'm not sure what that means.

Q    Do you disagree?

A    No, I don't.

Q    And EMG nerve study showed severe carpal tunnel syndrome; right?

A    Yes.

Q    And he recommended the left-sided open carpal tunnel release; right?

A    Correct.

Q    And you agreed to proceed?

A    Yes.

Q    Let me have you look at 871 and 872.

So on July 28, 2016, you had a left carpal tunnel release and left trigger finger surgery by Dr. Chalkin; correct?

A    Correct.

Q    Do you see where it says that in the Preoperative Diagnosis?

Page 88

A    Yes.

Q    And he recommends the patient undergo a Medrol Dosepak.

Do you see that?

A    Yes.

Q    Did you do that?

A    I did.  A steroid, I presume.

Q    And he stated he would consider an MRI and would see you back in six weeks; right?

A    Right.

Q    And then he added, "He is doing well from my perspective"; correct?

A    Yeah.  I wouldn't say that's correct.

Q    Let's look at his Plan.  Okay?  Look at the last sentence.  "He is doing well from my perspective."

Do you see that?

A    Uh-huh.

Q    Let's look at page 867.  This shows that on October 3, 2016, you returned to Dr. Chalkin?

A    Yes.

Q    You were there for a followup?

A    Okay.  Yes.

Q    Looks like it says September 7, 2016.

A    Yes.

Page 89

Q    What page are you on there?

A    867.

Q    So on 867 he gives you a release; right?

A    Yes.

Q    It says "Patient able to return to full duty, regular job, beginning September 7 of 2016."

A    Correct.

Q    Okay.  Now look at 866.  It says here, when you report to Chalkin, again -- correct? -- that you were doing much better?

A    October.

Q    October 3 of 2016.  It says "Today I will release him from the clinic.  If he has any questions at all, he will call me.  I cannot be happier with his results aside from the stiffness in his ring finger.  He will return to see me as needed."

Do you see that?

A    Yes.

Q    And then the History of Illness, second sentence, "He is doing much better."

A    Okay.

Q    Is that accurate?

A    That's accurate, yes.

Q    And the Dosepak had helped with your

Page 90

intermittent pain, soreness, and swelling; right?

A    Yes.

Q    You had no catching, locking, or triggering?

A    No.

Q    And you were released; correct?

A    Correct.  I never did have a locking, triggering --

Q    Okay.  You never had any catching, locking, or triggering?

A    Well, the locking part, from what I understand later, where the finger locks, it snaps, it just swells and it's stiff.

Q    What he's saying is:  You didn't have any of those at this time that you saw him.

A    Yeah.

Q    Correct?

A    Maybe at that time, yes.

Q    Let me have you look at page 864.  This reflects that on January 4, 2017, you returned to Dr. Chalkin; right?

A    January 04, yes, '17.

Q    And you were there to discuss upper extremity pain?

A    Yes.

Page 91

Q    And you stated it happens about twice a month; right?

A    Right.

Q    He notes that your neurosurgeon saw five to six asymmetric degenerative changes in the cervical spine on the right side.

A    Right.

Q    And your problems had always been on the left side; correct?

A    Right.  Correct.

Q    So do you think that might suggest that your pain on the left side occurred for some reason other than the accident?

A    No, I don't.  Absolutely not.

Q    He diagnosed you with left upper extremity intermittent severe pain and disabling symptoms with left shoulder pain; correct?

A    Yes.

Q    And he recommended an MRI of your left shoulder?

A    Right.

Q    Let me have you look at page 862 to 863. This shows that on February 3, 2017, you presented to Advantage Diagnostic for an MRI of your left shoulder; correct?

Page 92

A    Okay.

Q    And do you see where it says "Labral capsule or complex"?

A    Yes.

Q    And the third line, it says it's "compatible with a degenerative SLAP tear."

Do you see that?

A    Yes.

Q    And below that, on the next section, second sentence, it says "Degenerative remodeling with loss of concavity of the posterior osseous glenoid."  And then, again, it says "Degenerative acromioclavicular arthropathy."

MR. O'CONNOR:  How was that?

MS. WANDRES:  Not good.

BY MR. O'CONNOR:

Q    Do you see those notations from your physician?

A    Yes.

Q    And these are chronic and degenerative conditions; correct?

A    Correct.

Q    And the issue with your shoulder was certainly distinct and separate from your wrist issue; right?

Page 93

A    Correct.

Q    Let me have you look at page 861.  This shows that on March 20, 2017, you returned to Chalkin.  Do you see that?

A    Yes.

Q    And he says, "This MRI shows AC arthritis."  Do you see that?

A    Where are you seeing that?

Q    Look at Radiographs.

A    Okay.

Q    Do you see that?

A    Yes.

Q    He injected your left shoulder; right?

A    Right.

Q    Did that help with the pain?

A    I believe so.

Q    And he recommended therapy?

A    Okay.  Yes.

Q    Did you do that?

A    I went to a therapist one time.

Q    Who did you go to?

A    Redbud in Pryor.

Q    Did they help?

A    No, it really didn't.

Q    Okay.  He prescribed this Dosepak again.

Page 97

your medical treatment?

A    I believe so.

Q    And you've finished treating; correct?

A    Yes.  With my hand.

Q    Do you still have any pain or symptoms?

A    Yeah.

Q    Tell me about it.

A    Every time I do any kind of -- ride my motorcycle, for instance, that's probably the worst. I'll go out for a day and ride, and the next day or two, it will swell to the point where I can't even use it.  If I use the posthole digger -- really, any kind of vibration.

Q    Did you tell your doctor that --

A    Chainsaw.  I use a chainsaw a lot.

Q    Did you tell your doctor that you were using a posthole digger and chainsaw?

A    Specifically, those two items?  I don't know.

Q    Did you tell him you were riding your motorcycle?

A    I think so, but...

Q    What's the level of pain now?

A    Today -- today?

Q    Yeah.

the main things.  Fishing.

Q    Anything else?

A    Just use of the hand, in general.  But as far as hobbies --

Q    I'm just trying to -- you've mentioned posthole digger, chainsaw, motorcycle, kayaking. I'm just trying to see how it affects your life.

A    Those are the main things that it affects, the things I like to do mostly.

Q    Okay.

MR. O'CONNOR:  Why don't we break for about an hour?

THE VIDEOGRAPHER:  We are off the record. The time is 11:50.

(Off the record)

THE VIDEOGRAPHER:  We are on the record. The time is 1:01.

BY MR. O'CONNOR:

Q    Did your health insurance pay for your medical bills that arose from this accident?

A    Yes.

Q    And you just don't remember if it was Community Care or Global?

A    At the time, yes.  Should have been Global, but it could have done -- there was a change

Page 100

from Community Care to global about that time.

Q    Okay.  No liens or any claims were filed against you as a result of unpaid medical bills?

A    No.  I don't think so, no.

Q    Do you know what the amount of medical bills was that you incurred after this February 23, 2016, accident?

A    Personally, no.

Q    We've gotten bills that reflect just over $27,000 in medical bills and discovery responses that say the same.  Do you think that's accurate?

A    Yeah.  I think I seen somewhere that it was in that range.

Q    Okay.  And Exhibit 3, which is in front of you, look at page 332.

A    332.  Yes.

Q    This is a Summary of Damages.  It shows medical bills.  Do you believe that to be complete?

A    I believe so.

Q    Are you aware of anything else?

A    No.

Q    Do you know what the mileage expense is and what support for that number?

A    Without going through it all, no, I can't support it at this time.

Q    And do you think the entirety of this $27,667.97 are medical bills related to the 2016 automobile accident?

A    Yes.

Q    And not for any other cause?

A    No.

Q    No pre-existing injury?

A    No.  No.

Q    And not any degenerative conditions?

A    Well, no.  I know I have degenerative conditions in my spine, but other than that, no.

Q    Well, the medical records reflect where the physicians concluded you had degenerative conditions.

A    Yeah, I know.

Q    Are you seeking recovery of medical expenses related to the degenerative conditions?

MS. WANDRES:  Object to the form.

THE WITNESS:  For the degenerative conditions?

BY MR. O'CONNOR:

Q    Yeah.

A    No, I'm not.

Q    Tell me how you reported the accident to Safeco.

A    My ongoing injuries.  My injuries to my left hand.

Q    Did you ever personally have any communications with Safeco on the claim?

A    Not to my knowledge.

Q    All right.  And how did you find Mr. Wandres?

A    My wife did some research online.

Q    All right.  Look at page 787.  You do recall giving a recorded statement to Safeco; right?

A    I remember being in the emergency room getting a phone call sitting on the bed, and I gave a partial one because the doctor walked in in the middle of it -- a deposition, I think it was called.

Q    Okay.  A recorded statement?

A    Yeah.

Q    So that would have been some form of communication you had with Safeco?

A    Yes.

Q    Page 787 is a letter from Safeco, Christine Sullivan to your counsel, also dated August 11, 2016.  Would you agree that that was prompt in responding the very same day that your counsel sent a letter?

A    Yes.

Q    And in this letter, she requests medical bills, records, reports, wage loss documents, medical and wage authorizations, your recorded statements, and prior medical records; right?

A    Yes.

Q    And we went over earlier your duty to supply those materials and information under the policy; correct?

A    Correct.

Q    And you understand that once you retain an attorney, Safeco can't communicate directly with you anymore; right?

A    No.  I was unaware of that.

Q    Did your attorney ever advise you of that?

A    I don't know.

Q    So you would agree that your counsel would then have the duty to supply the items that are obligated under the policy; correct?

A    Right.

Q    Let me have you look at page 786.  This is a claim note from Christine Sullivan at Safeco on August 11, 2016, at 3:27 p.m., stating that she had spoke with your counsel; correct?

A    Yes.

Q    And she advised that she had received a

Page 110

letter of representation; right?

A    Okay.  Yes.

Q    And your attorney said he wanted to file a UM for possible UIM exposure; correct?

A    Correct.

Q    That would suggest that counsel at that time didn't think the UIM claim was ripe; right?

MS. WANDRES:  Object to the form.

THE WITNESS:  I don't know what that means.

BY MR. O'CONNOR:

Q    Well, there's an indication here that he says, "Attorney advised he wanted to file UM for possible UIM exposure."

MS. WANDRES:  Objection.

BY MR. O'CONNOR:

Q    So there's no certainty at that point that there is UIM exposure?

MS. WANDRES:  Object to the form.

THE WITNESS:  I don't know what UIM exposure is.

BY MR. O'CONNOR:

Q    Well, do you understand that for underinsured or uninsured motorist coverage, there needs to be some trigger for it to come in play?

Page 112

your counsel knew at that time either; correct?

MS. WANDRES: Object to the form.

BY MR. O'CONNOR:

Q    Because it says "possible UIM exposure."

MS. WANDRES: Same objection.

THE WITNESS: I don't know. I couldn't tell you that.

BY MR. O'CONNOR:

Q    So your attorney says that he wanted to have the file ready in the event that they need to utilize the insured's policy; correct? Do you see that?

A    Yeah. I see that.

Q    And it says "Attorney advised he did not have files so did not have all the details of the injuries"; correct?

A    Correct.

Q    And Ms. Sullivan advised that your claim would be transferred to someone else to look at the UIM coverage; right?

A    Where do you see that?

Q    Last line of page 786.

A    Yes. Okay. Yes.

Q    And you would agree that Ms. Sullivan was prompt in both sending your counsel a letter and

having a phone call with him on the same day he sent his Letter of Representation; right?

A    Yes.

Q    Look at page 783.  This is an August 15, 2016, letter from Danielle Lucas at Safeco to your counsel; correct?

A    Correct.

Q    And she states that the claim has been reassigned to her for handling and asked for -- that counsel forward any further correspondence directly to her; correct?

A    Correct.

Q    And, again, this was -- would you agree this was prompt in assigning -- Safeco was prompt in assigning the claim to Ms. Lucas?

A    Yes.

Q    And she was prompt in reaching out to your counsel?

A    Yes.

Q    You never communicated with Rachel Woods or Christine Sullivan; right?

A    Not to my knowledge.

Q    Let's look at page 782.  This is a note from Ms. Lucas on August 15 of 2016, at 12:11 p.m. It states that she called your counsel and left a

Page 114

message with his assistant.

You would agree that this was prompt and thorough in sending a letter as well as making a phone call to reach your counsel?

A    On what date was this?

Q    August 15, 2016.

A    Yes.

Q    Look at page 781.  This is another note from Ms. Lucas, two days later, on August 17, 2016. She called your attorney again to confirm injuries and treatment; correct?

A    Yes.  That's what it says.

Q    And your attorney stated that your wife, Lori, didn't have a UIM claim and she didn't even treat; correct?

A    It says that, yes.

Q    Which that's accurate; correct?

A    I'm not sure.  What does that mean?

Q    Well, your wife didn't get treated for any injuries arising from this accident?

A    Correct.

Q    So she wouldn't have any UIM claim?

A    Yes.  Correct.

Q    And you believe that's accurate?

A    Yes.

Page 115

Q    She's not a plaintiff in this lawsuit. She didn't sustain any injuries --

A    No.

Q    -- as a result of this accident?

A    Correct.

Q    And your attorney at this stage is advising that he had just received the claim and didn't have a lot of information; correct?

A    At this point?

Q    Correct.  Do you see where it says he just received this claim and did not have a lot of info at this time?

A    I can't say --

Q    Fourth line down?

A    Yeah.  I don't know that for a fact, but, yeah, that's what it says.

Q    And he shared that you had had a surgery to your left hand for carpal tunnel release; correct?

A    Yeah.  Yes.

Q    And you were undergoing physical therapy at the time?

A    I went there one time.

Q    Okay.  So when it says "Current physical therapy for right hand and neck," that was the one

Page 116

occasion?

A    Yes.

Q    And it says, "Did not have medical at the time." So your attorney didn't have the medical bills or records as of August 17 of 2016?

A    Yeah. I don't recall.

Q    And you would concur that Ms. Lucas would need your attorney's cooperation to get the medical bills and records; right?

A    Right.

Q    Let me have you look at page 777. This is an August 22, 2016, letter from Ms. Lucas to your counsel.

A    That's page 777?

Q    Yes.

A    Okay.

Q    And here Ms. Lucas reiterates that the claim was assigned to her. She asked for your medical bills, records and reports, wage loss documentation, your recorded statement and medical records from five years prior to the accident.

This is the second time Safeco's requested that information; right?

A    Well, I don't know.

Q    Well, we just went over another --

Page 117

A    Yes.

Q    -- request that included the same list. Do you remember that?

A    Yes.

Q    So this would be the second time that Safeco requested the information?

A    Okay.

Q    Do you agree?

A    I agree.

Q    Let me have you look at page 773. Look at page 776, but don't move too far from there. We're going to come back to where you are.

A    Okay.

Q    So 776 is a letter dated August 22, 2016, from Ms. Lucas to your counsel, and here, Safeco's requesting a completed medical authorization form; correct?

A    Yes.

Q    And if you'll look at the preceding pages, 773, 774, and 775, that is an authorization to disclose health information and other records that was supplied, and you see your name and your claim number on page 773?

A    Yes.

Q    Would you concur that Ms. Lucas was

Page 118

diligent in working to obtain your medical bills and records?

MS. WANDRES:  Object to the form.

THE WITNESS:  I don't see a date here.

BY MR. O'CONNOR:

Q     Well, it came with the August 22, 2016, letter that we looked at at page 776.

A     Okay.  So August -- yes.

Q     Let me have you look at --

A     Six months.

Q     Well, we're not talking about six months. We're talking about a few days from when your counsel sent a Letter of Representation only a couple days after the request for medical information had been supplied?

A     That would be prompt, yes.

Q     Let me have you look at page 771.  Did you know that Safeco placed 100 percent liability on the other driver, Mr. Koch?

A     No.

Q     Can you -- do you see on page 771, down at the bottom, it says "Liability decision"?

A     I do.

Q     Okay.  It says "100 percent liability. Claimant is insured with Safeco.  They have limits

Page 119

of 25/50."

Did I read that accurately?

A    You did.

Q    So Mr. Koch had coverage of 25,000 per person and 50,000 per accident?

A    Yes.

Q    Does that refresh your recollection on that issue?

A    Yeah.  Yes.

Q    And we discussed earlier that your UM policy would only be triggered if Mr. Koch's $25,000 is insufficient to cover your injuries, your treatment, incurred as a result of the accident; correct?

A    Correct.

Q    If your injuries and treatment that are related to the accident are covered adequately by Mr. Koch's policy, then your UM policy would not be at issue; correct?

A    Right.  Correct.

Q    Do you know what you received from Mr. Koch?

A    I do not.

Q    Through his insurance?

A    I presume they paid my medical.

Page 120

Q    Do you know if you received $25,000 --

A    Yes, I do.

Q    -- from Mr. Koch's policy?

A    Yes.  Yes.

Q    Did you receive that as payment towards your medicals or did you receive that as a direct payment to you?

A    I did not receive $25,000, no.

Q    Do you remember what you received from Mr. Koch's coverage?

A    Personally, I received about $13,000.

Q    And the rest was applied and paid to your medical --

A    Medical and attorney fees.

Q    Medical and attorneys?

A    Yes.  Yes.

Q    I'm sorry.  We're doing the same thing that your counsel and I've advised.  She's got to get me and then you.

A    Okay.

Q    I'll let you finish and you let me. You're doing fine.

A    Thanks.

Q    So let me have you look at page 770.  This is a September 22, 2016, claim note from Ms. Lucas

that states that she called your counsel to follow up regarding your claim.

Do you see that?

A    Yes.

Q    And to verify that he had received your employment information; correct?

A    Correct.

Q    And, again, she left a message; right?

A    Yes.

Q    And this was 30 days after Ms. Lucas' prior letter; correct?

A    Again, I don't see a date.

Q    There's a date at the top, September 22, 2016.

A    Okay.  Correct.

Q    And your counsel had not supplied the requested information; right?

A    That's what it says, yes.

Q    So at that point, Safeco had not been provided the medical records release; right?

A    Yes.

Q    Or recorded statement from you?

A    That's what it says here, yes.

Q    All right.  Let me have you look at page 769.  This is a letter from Ms. Lucas dated

Page 122

September 22, 2016, which she sent to your counsel and requested a call to discuss the claim; correct?

A    Correct.

Q    So she's -- you would consider her still as diligent and thorough at following up; right?

A    I would.

Q    Let me have you look at page 762.  This is a claim note from December 2, 2016, by Ms. Lucas. She indicated that she had called your attorney regarding the status of your claim and left another message with his assistant; correct?

A    Yes.

Q    And we're now nine months after the accident; right?

A    Correct.

Q    Still no information supplied to Safeco; correct?

MS. WANDRES:  Object to the form.

THE WITNESS:  I don't know if that's correct or not.  From what I've read, yes.

BY MR. O'CONNOR:

Q    So you're not aware that as of December 2, 2016, that your counsel had not supplied a recorded statement or a medical release; correct?

A    I don't recall.

Page 123

Q    You don't know differently?

A    Correct.

Q    You don't know one way or the other?

A    Right.

Q    Let me have you look at page 761.  This is another note from Ms. Lucas on December 8, 2016, indicating that she had called your attorney and left another message with his assistant; right?

A    Right.

Q    Page 760 is a December 8, 2016, letter from Ms. Lucas to your attorney indicating that she's trying to reach him regarding the status of the accident and requested a return call; correct?

A    Correct.

Q    And you would agree Ms. Lucas was diligent in following up, wouldn't you?

MS. WANDRES:  Object to the form.

THE WITNESS:  Yes.

BY MR. O'CONNOR:

Q    Let me have you look at page 757.  At the bottom of this page, there's a January 10, 2017, e-mail from your attorney to Ms. Rachel Butler, dated January 10 of 2017.

Do you see that?

A    I'm trying to get to it.

Q      Page 757.

A      757.  Okay.

Q      Do you see the e-mail at the bottom from Mr. Wandres to Rachel Butler at Safeco, dated January 10 of 2017?

A      Yes, I see that.

Q      And in the e-mail, he states that you had had carpal tunnel release and may be facing surgery; correct?

A      Correct.

Q      And if you look at the top of that page, you can see that Ms. Butler responded the very next day at 8:36 a.m.

Do you see that?

A      Yes.

Q      And she indicates that Ms. Lucas had been trying to reach him, your counsel, since August, regarding the status of the case; correct?

A      Correct.

Q      And, again, she asked for medical records and information about the surgery; right?

A      Right.

Q      She explains that there was no damage to your vehicle; correct?

A      Correct.

Page 125

Q    She asked for prior medical and employment records; true?

A    Yes.  That's what it says here.

Q    And then she asked your counsel to provide the status promptly; right?

A    Yes.

Q    And she states, "This case is almost a year old with very limited communication"; correct?

A    Where do you see that?

Q    Last sentence -- next to last sentence.

A    Okay.

Q    "This case is almost a year old with very little communication."

A    Yes, I see that.

Q    Would you agree with that?

A    Yes, I agree with that.

Q    Did you ever speak with Ms. Butler or communicate with her in any way?

A    I don't believe so, but I can't recall.

Q    If you had any written communications with her, you would have produced those; correct?

A    Absolutely.

Q    Let me have you look at page 747.  Have you seen this document before?

A    It looks -- this is my car, isn't it?

Page 127

Q    And how did you communicate that to Safeco?

A    Well, he had given me his card.  I had called him.

Q    Who is "he"?

A    The adjuster that came out to look at my car --

Q    Okay.

A    -- and he did not answer.  I left a message, and then no response, and I e-mailed him.

Q    Did you advise your attorney that you had damages to your vehicle?

A    I'm not even sure I had an attorney at that time.

Q    At any time?

A    So -- no.

Q    At any time?

A    Yes.  Absolutely.

Q    Okay.  Look at pages 745 and 746.

A    Yes.

Q    What are these?  What are the photographs?

A    They're the back of my car.

Q    Okay.  Are these the photos that would show no damage to your car?

A    Yes.

Page 128

Q    And is it your testimony under oath today that your counsel has made some claim for damage to your car arising out of this accident?

MS. WANDRES:  Object to the form.

THE WITNESS:  Yes.

BY MR. O'CONNOR:

Q    Look at page 664.  This is a January 16, 2016, e-mail from Rachel Butler to your counsel showing that she had e-mailed him a copy of the certified policy as requested; correct?

A    Correct.

Q    And if you look at 663, this is a February 22, 2017, e-mail -- I'm sorry -- claim note, from Danielle Lucas reflecting a telephone call from your counsel where she followed up regarding you and your wife; right?

A    Right.

Q    And your counsel stated that you were still treating and that you were following up with physical therapy; correct?

A    Correct.

Q    And your attorney did not have medical bills and records; right?

A    Correct.

Q    And your counsel said he would not supply

Page 129

an authorization until he was ready to send a
demand; correct?

    A    Correct.

    Q    We discussed earlier that you had a duty
under the policy to supply signed medical
authorizations; right?

    A    Would you repeat that?

    Q    Yes.

         We discussed earlier that you had a duty
under the policy to supply signed authorizations;
correct?

    A    Correct.

    Q    We're now a year out since the accident
occurred; correct?

    A    Correct.

    Q    And Safeco still doesn't have the
requested information; right?

    A    I don't know that.

    Q    Well, we've been through all these
exchanges between Safeco and your lawyer.  Have you
seen any documentation where a medical authorization
or any medical bills or medical records have been
supplied --

    A    No.

    Q    -- to Safeco?

Page 130

A    I haven't.

MS. WANDRES:  Object to the form.

BY MR. O'CONNOR:

Q    And, in fact, there was an indication they weren't going to be supplied until there was a demand made; correct?

A    Correct.

Can I say something about that vehicle picture?

Q    Sure.

A    On that vehicle picture, you'll notice there's a trailer hitch.  He directly hit that trailer hitch, which extends so far out right in the middle of his car and --

Q    Still didn't do any damage?

A    Well, why would it?  It's attached to the frame.  That's my point.  It destroyed his car, but it hit my trailer hitch.

Q    Gotcha.  So no damage to your car?

A    Correct.

Q    Page 662 is a March 22, 2017, claim note from Ms. Lucas documenting her call to your counsel where she asked about the claim; right?

A    Right.

Q    And counsel's assistant said he wasn't

Page 131

available and takes a message; right?

A    Right.

Q    Page 661 is a letter dated March 22, 2017, from Ms. Lucas to your attorney, asking to discuss the accident and requesting a return call.

A    Yes.

Q    And would you agree that Ms. Lucas was diligent in following up on this issue?

A    Yes.

Q    Page 660 is a claim note document which memorializes another phone call from Ms. Lucas to your counsel on April 26, 2017, to talk about your attorney -- to talk to your attorney about the claim; right?

A    Yes.

Q    And it indicates that your counsel's assistant stated he wasn't available and took a message; right?

A    Correct.

Q    And we're now 14 months after the accident; correct?

A    Correct.

Q    Let me have you look at page 659.  This is an April 26, 2017, e-mail from Ms. Lucas to your counsel asking for an updated treatment status for

Page 132

you and your wife; right?

A     Right.

Q     And if you look at page 658, this is a June 14, 2017, claim note documenting yet another phone call from Ms. Lucas to your counsel on that same day asking to discuss the claim and leaving a message; correct?

A     Yes.  Correct.

Q     We're now 16 months after the accident; right?

A     Correct.

Q     Look at page 657.  This is a June 14, 2017, letter from Ms. Lucas to your counsel stating that she had been trying to reach him regarding your claim; correct?

A     Right.

Q     She asked for a return call; right?

A     Yes.

Q     Would you agree that she was diligent in continuing to follow up?

MS. WANDRES:  Object to the form.

THE WITNESS:  Yes.

BY MR. O'CONNOR:

Q     Page 656 is an August 8, 2017, claim note from Ms. Lucas following your attorney to follow up

Page 133

on your claim; right?

A    Right.

Q    And your counsel stated that you were done treating and that he was putting together a demand; correct?

A    Correct.

Q    And Ms. Lucas asked if you had other treatment, and your counsel asked to call her back on Thursday; correct?

A    Correct.

Q    So at least as of August 8, 2017, you had finished treating for your injuries that you're claiming for this accident; right?

A    Correct.

Q    Let me have you look at page 655.  This is an August 8, 2017, e-mail from Ms. Lucas to your counsel asking for information on how you treated; right?

A    Yes.

Q    And she asked for a total of your bills and a breakdown of who you were treated with?

A    Correct.

Q    Would you agree Ms. Lucas was diligent in following up on this information?

A    Yes.

Page 135

A    That's what it says here, yes.

Q    Look at page 648.

A    648.

Q    This shows that on August 30, 2017, Ms. Lucas sent another follow-up mail requesting the information; correct?

A    Correct.

Q    And if you look at page 632 and 633, this is a claim note from Ms. Lucas --

A    I'm not there yet.

Q    Oh, sure.

A    Okay.

Q    This is a claim note from Ms. Lucas summarizing your recorded statement taken on October 16, 2017.  Do you see that?

A    I see that.

Q    Do you recall giving this statement?

A    Yes.

Q    And you agreed there was no visible damage to the car; right?

A    That is right.

Q    And you stated you were in a prior accident 35 years ago; right?

A    Yes.

Q    You stated you were a maintenance worker

Page 138

A    I'm not sure what the hours were at that time.

Q    Okay.

A    It was shift work.

Q    Look at the next paragraph.  It says "He has continued working since this accident.  He's missed 10 days of 10-hour shifts.  He makes $34.50 an hour."

Is that accurate?

A    That's accurate.

Q    And you indicated at that time that you had health insurance through Global Health and that you were done treating; correct?

A    Yeah.  I couldn't tell you who I had at that time, 2006.

Q    It's what you represented --

A    Okay.  Then, yes, that's what it was.  We must have looked it up.

Q    Let me have you look -- and your wife hadn't been to the ER or sought any treatment; correct?

A    Correct.

Q    Look at page 622.  This is an e-mail from Danielle Lucas to your counsel dated October 16, 2017, stating that she needs your prior records;

correct?

A    Correct.

Q    Due to the lack of damage to your car?

A    Uh-huh.

Q    She asked your counsel to have you supply a medical authorization?  And the last question, you need to say "yes" or "no," not an "uh-huh."

MS. WANDRES:  It's for the record.  Typing down "uh-huh" and "huh-uh" is hard to understand.

THE WITNESS:  Okay.  Yes.

BY MR. O'CONNOR:

Q    So she stated she needed your prior medical records; right?

A    Yes.

Q    And she said "due to the lack of damage to your car"; correct?

A    Correct.

Q    And she asked your counsel to have you supply a medical authorization; right?

A    Right.

Q    And to list your providers for the five years preceding the accident; correct?

A    Correct.

Q    And you agree that it was reasonable for Ms. Lucas to want to see your prior medical records;

Page 140

right?

A    Right.

Q    And given that your car had no damage; correct?

A    Correct.

Q    And because your policy only covers injury sustained as a result of the subject accident; right?

A    Would you repeat that?

Q    Because your policy as we went over earlier --

A    Yes.

Q    -- only covers injuries that were sustained as a result of the June 23, 2016, accident?

A    Correct.

Q    Let me have you look at page 599.  This is another e-mail dated December 11, 2017, to your counsel, from Ms. Lucas following up on her previous e-mail; correct?

A    Yes.

Q    And we're now a year and ten months after the accident; correct?

A    Yes.

Q    Let me look at page 586, which shows that

on December 11, your counsel finally supplied the requested authorization; correct?

A    Correct.

Q    Look at page 329.  This is a letter from your counsel to Ms. Lucas dated April 29, 2018, stating that medical bills and records were enclosed; correct?

A    Correct.

Q    And a release?  He supplied the release; correct?

A    I don't see a release on here.

Q    If you look near the end of the first paragraph, it says "Please find a medical/employment release for Mr. Perry"?

A    I do.  Correct.

Q    Now, this information is being supplied over two years after the accident; correct?

A    Correct.

Q    And she asserts that you sustained lost wages of more than $2,500; right?

A    Yes.

Q    And she makes a claim for UM limits.  Do you see that?

A    Where exactly is that?

Q    Look at the third paragraph, last phrase

of last sentence.  It says "Demand is hereby made, that Safeco tended the limits of the available UM policy limits."

Do you see that?  Last sentence of the -- next to last paragraph.

A     Next to last paragraph.

Q     It's not "Should you have any questions," it's the sentence right above that.

A     I'm sorry.  I'm having a hard time seeing this.

Q     Sure.

Can you see the last sentence that says "Should you have any questions or require any further documentation"?

A     Yes.

Q     Look just at the sentence just above that.

A     Okay.

Q     Do you see where the "Demand is made for the policy limits under the UM policy"?

A     Yes.

Q     And you would agree that this is the first time that counsel's made a UIM demand or claim?

MS. WANDRES:  Object to the form.

THE WITNESS:  That's what it reads, yes.

BY MR. O'CONNOR:

Page 143

Q    Let me have you look at page 314.  This is an e-mail from Danielle Lucas to your counsel on May 3, 2018, where she states some bills were missing and asked your attorney to supply those.

Do you see that?

A    Yes.

Q    And she indicates that she has not received your prior medical records; correct?

A    Correct.

Q    And she's having trouble with the authorizations being returned; right?

A    Correct.

Q    She says that providers keep returning the authorizations; right?

A    Right.

Q    Are you aware of that?

A    (Witness shakes head side to side)

Q    Were you aware of that?

A    No.

Q    And she asked your counsel to supply the prior records; correct?

A    Correct.

Q    Let me have you look at page 311.  This is a responsive e-mail from your counsel dated May 3, 2018.

Page 144

A    Okay.

Q    And here she states that she has not obtained bills because it would cost you money.

Do you see that?

A    Yes.

Q    And she hasn't obtained prior records for the same reason.  Do you see that in the next paragraph?

A    Yes.

Q    So this wouldn't be in compliance with your duties and obligations in the policy to provide the information that we discussed earlier today; correct?

A    Could you rephrase that?

Q    Yeah.  The refusal to supply the billing records from Cavanaugh Hill Emergency or to obtain the prior records would not be in compliance with the duties and obligations of the policy that we went over this morning; correct?

MS. WANDRES:  Object to the form.

THE WITNESS:  I'm not sure I understand your question.  I'm sorry.

BY MR. O'CONNOR:

Q    Well, have you read the e-mail?

A    I'm trying to, but --

Page 145

Q    Do you want to read it?

A    Yes, please.

Q    Okay.

A    Okay.

Q    Okay.  Having read the e-mail --

A    Yes.

Q    -- do you think that it is in keeping with your duties and obligations to cooperate and to provide information that we discussed earlier in your policy today?

A    Yes.

Q    How so?

A    I think they should be doing their job.

Q    Your counsel?

A    Yes.

Q    And it certainly -- you understand that it was reasonable for Ms. Lucas to need those prior records in order to complete her evaluation; right?

A    Yes.

Q    And it certainly would have been easier, quicker, for your counsel to provide the bills and records; right?

A    Yes.

Q    Now, earlier you mentioned Mr. Koch paid you $13,000?

Page 146

A    Yes.

Q    And he had a policy of $25,000, so the balance of that went to attorney's fees and medical expenses; correct?

A    That's what I understand, yes.

Q    And do you know what counsel received -- fees -- from Mr. Koch's coverage?

A    No, I do not.

Q    But somebody representing you?

A    What do you mean?

Q    Well, what did you mean when you said out of that $25,000 policy, 13 went to you and the rest went to attorney fees and medical expenses?

A    Yes.  That's what I was told.

Q    Okay.  So who -- what attorney?

A    My attorney.

Q    Your current attorney?

A    Yes.

Q    Look at page 298.  This is a May 8, 2018, e-mail from Ms. Lucas to your counsel stating that there was no damage to your vehicle; right?

A    Correct.  I'm not -- okay.  There was no damage; correct.  Okay.

Q    So at the time, she believes that you were fairly compensated by Mr. Koch's carrier's payment

of $25,000; right?

A   Are you asking me?

Q   Yes.

A   For what I've went through, I don't believe it's a compensation.

Q   I'm saying: As of May 8, 2018, Ms. Lucas says, "At this time, it appears that Mr. Perry has been fairly compensated by the tortfeasor's carrier" -- in other words, by Mr. Koch's carrier.

Do you recall that?

A   Right.

Q   Do you recall that?

A   No.

Q   And she asked if your counsel would be able to obtain a full copy of all prior records; right?

A   Right.

Q   It says "We are having trouble obtaining prior records with the authorizations that were supplied.  If your office would like to retain the records, we will review accordingly upon receipt. Please contact me should you have any questions."

Did I read that accurately?

A   You did.

Q   You understand that your counsel declined

Page 148

to supply your prior medical records?

A    According to what this reads, yes.

Q    Do you know why?

A    I do not.

Q    Was there something you were trying to hide in your prior medical treatment or records?

A    Me?

Q    Or your counsel?

A    Not that I'm aware of.

Q    If the records are favorable, do you know why they just weren't produced?

A    I do not.

Q    But you agree you have a duty to supply that information; right?

A    Yes.

Q    And to cooperate with Safeco?

A    Yes.

Q    And you agree Safeco needed those records to evaluate your claim; right?

A    Yes.

Q    And it's certainly reasonable for Safeco to request them?

A    Yes.

Q    Let me have you look at page 284, 285. This is a May 15, 2018, letter from Ms. Lucas to

Page 149

your counsel stating that she wanted to have an independent medical examination of you?

A    Yes.  I agree to that.

Q    And possibly a biomechanical review?

A    Yes.

Q    Correct?

A    I remember that.

Q    And she said that she was continuing her efforts to obtain your prior medical records; right?

A    Yes.  That's what it says.

Q    And continuing to evaluate your claim; right?

A    Right.

Q    You understand that Ms. Lucas had not denied your claim; correct?

A    No.  I didn't know that, no.

Q    This is not a denial; right?

A    Right.

Q    Correct?

A    Correct.

Q    And you have confirmed that you have a duty under the policy to submit to medical examination; right?

A    Right.

Q    Nothing improper in Ms. Lucas requesting a

Page 150

medical examination?

A    No.

Q    Or biomechanical review?

A    No.

Q    Or continuing to try to obtain prior medical records?

A    No.

Q    Let me have you look at page 265.  This is a May 16, 2018, claim note from Ms. Lucas indicating that she had spoke with Redbud Physical Therapy; correct?

A    Correct.

Q    And that the woman at Redbud had explained the date of birth on your authorization was not correct.

Do you see that on the third line?

A    Yeah.  No, I didn't know that.  Okay. That's correct.

Q    You completed the authorization; right?

A    I don't know.

Q    Were you aware that the authorization had your incorrect birth date?

A    No.  No.

Q    Did you know if you wrote an incorrect birth date?

Page 151

A    I wouldn't think so.

Q    Okay.  Do you understand that the inclusion of the improper birth date impeded Ms. Lucas' investigation?

A    Showing a        1958.  That's correct.

Q    That's your correct birth date?

A    That is my correct birth date.

Q    Do you know what date the authorizations had?

A    No.

Q    Do you know who completed the authorization?

A    I do not.

Q    The authorization showed a birth year of 1968.

A    Yeah.  That's incorrect.

Q    Do you understand how that might -- why providers might be returning the authorizations without any records if it had the wrong birth date?

A    Something on that, you think they would just call and get a correct date.

Q    Well, Ms. Lucas didn't know it was an incorrect date until she was advised; right?

A    Right.

Q    So you're not blaming her for you or your

Page 152

counsel putting an improper birth date on the medical authorization; right? And "her" being Safeco and Ms. Lucas?

A    I would think she would just make a call and say, "Hey" -- or just change it.

Q    Do you remember when we went over the call note where counsel was advising --

A    If she were --

Q    Let me finish.

Do you remember earlier when we went over the call note where she advised your counsel that the providers were returning the medical authorizations?

A    Right. That was --

Q    She wasn't aware there was an improper date at the time?

A    Okay.

Q    Okay? So perhaps your counsel could have reviewed the authorizations and remedied that situation at the time; right?

A    Right.

Q    But now we're sitting here in May of '18, finally recognizing that what we received -- what Safeco received had improper information about you; right?

Page 153

A    Right.

Q    And providers certainly aren't going to provide information when they have improper personal information about the insured; correct?

A    Correct.

Q    Let me have you look at page 257, which is a May 16, 2018, e-mail, from Ms. Lucas to your counsel.  She says, "I believe I have solved the mystery on why we were having so many problems in obtaining medical records for your client."  She explained this birth date issue with the authorizations; right?

A    Yes.

Q    She asked your counsel to update the forms; correct?

A    Correct.

Q    Look at page 244.  On May 16, 2018, your counsel confirmed your birth date and said that he would send updated authorizations this afternoon; right?

A    Right.

Q    And apologized for the mixup.  That's on page 226.

Do you see where he apologized?

A    I do not.

Page 154

Q    Look at page 226.  This is an e-mail from Ashley Leavitt dated May 16 of 2018.  Do you see that at the top?

A    Yes.

Q    And it has Mr. Wandres' name as the signatory.  It says, "I'm so sorry about this mixup.  Attached are the updated authorizations."

Do you see that?

A    I do.

Q    And that's as of May 16, 2018; right?

A    Correct.

Q    Let me have you look at page 116.  This is a June 11, 2018, e-mail from Ms. Lucas to your counsel indicating about the third sentence that she explained the authorizations had the wrong birth date; right?

Do you see where it says, "however, the authorizations we received did not have your client's correct date of birth attached, therefore, we were never able to obtain records from most of the providers.  We have recently received updated authorizations from your office and are in the process of reordering the records."

Do you see that?

A    Yes.

Page 156

A    Yes.

Q    And you filed a lawsuit against Safeco on September 18 of 2018; correct?

A    I'm not sure when it was.

Q    I'll tell you that's when it was.

A    Okay.

Q    Do you have any reason to doubt that?

A    No.

Q    So you filed the lawsuit before the IME could take place; right?

A    Yes.

Q    Do you know why you filed a lawsuit in September of 2018?

MS. WANDRES:   Object to the form.

THE WITNESS:   One was for the time period it took -- it's been taking this -- these issues. Like I said, it's been three years.   It looks like somebody's dragging their feet.

BY MR. O'CONNOR:

Q    We've been through all the communications --

A    I understand that.

Q    -- with Safeco; right?

A    Correct.

Q    Do you think Safeco was dragging its feet

Page 157

when you filed your lawsuit?

A    Well, I'm not -- it's something I would have to think about after reading all this.

Q    Well, you brought the suit in September of 2018.  I'm here to depose you, and I need to know, for the record, if you think, given what you've gone over today and seeing the communications with your insurance carrier between you and the carrier, between your wife and the carrier, and between your counsel and the carrier, if you think Safeco was dragging its feet when you filed that lawsuit?

MS. WANDRES:  Object to the form.

THE WITNESS:  Just from what I've seen and heard, yes.

BY MR. O'CONNOR:

Q    How did Safeco drag its feet?

A    No.  I'm saying the opposite.

Q    So you're saying Safeco did not drag its feet?

A    That's what I'm saying, from what I've seen.

Q    Do you think --

A    Or heard.

Q    What is it that you think Safeco did wrong, if anything?

Page 158

A    Well, I don't believe for the pain and suffering and the future pain and suffering that I will receive -- I received enough compensation, for one thing.

Q    So when you say "pain and suffering and suffering," are you talking about --

A    Future suffering.

Q    And future suffering?  Is this from your wrist injury?

A    Strictly from my wrist, yes.

Q    Okay.  Tell me what it is that you think Safeco did wrong in its handling of your claim.

A    The period of time that it has taken.  And this has just been brought to my attention, where we have been reading, so --

Q    I thought just a moment ago you said you were no longer attributing the period of time that it has taken to Safeco?

A    Yeah.

Q    Is that accurate?

A    Yes.

Q    You attended an IME with Dr. Jabbour on February 21 of 2019; correct?

A    That is correct.

Q    How did that go?

Page 159

A    It was kind of odd.

Q    How so?

A    He never examined my wrist.

Q    What did he do?

A    Basically told me that he doesn't like doing these kinds of things and examined my shoulder.  He put me through a series of motion tests, strength tests with my shoulder.

Q    Do you agree Dr. Jabbour is a qualified physician?

A    Absolutely.

Q    You don't have any issues with his skills or qualifications; right?

A    No.

Q    Have you reviewed his IME report?

A    I don't think so.

Q    Let me hand you what's been marked as Exhibit 4.

MS. WANDRES:  When we get to a good stopping point, can we take a quick break?

MR. O'CONNOR:  Sure.  Why don't we do that now?

THE VIDEOGRAPHER:  We are off the record. The time 2:20.

(Off the record)

THE VIDEOGRAPHER:  We are on the record.
The time is 2:34.

(Exhibit 4 marked for identification)

BY MR. O'CONNOR:

Q    I've handed you Exhibit 4, which is
Dr. Jabbour's IME report.  Have you seen that
before?

A    No, I have not.

Q    Are you aware that Dr. Jabbour diagnosed
you with cervical disc disease?

A    No.

Q    And if you look at page 971.

A    This right here (Indicating)?

Q    Yes.

A    Yes.

Q    In the second -- I'm sorry.  In the very
first paragraph, it says -- it says in the third
sentence, "The questions I was being asked of is
left carpal tunnel syndrome with surgery performed
and SLAP tear."

Do you see that?

A    No.  Third paragraph --

Q    No, no, no.  First paragraph, second
sentence.  "The questions I was being asked of --

A    Yes.  Yes.

Page 161

Q    -- is left carpal tunnel syndrome with surgery performed and SLAP tear"; correct?

A    Correct.

Q    Then if you look on page 972 under "Physical Examination."  On the very first line, it says, "The patient complains primarily of his left hand and then his left shoulder"; right?

Do you see that?

A    On the second page?

Q    Page 972 at the bottom.

A    On the bottom.  Okay.

Q    And it says "Physical Examination" on the heading near the bottom.

A    Yes.

Q    And in the first sentence, it says, "The patient complains primarily of his left hand and then his left shoulder."

A    Right.

Q    Okay.

A    "Trumps the left shoulder. "

Q    He states that the left hand trumps the left shoulder.

A    Correct.

Q    And then if you go down about three or four lines there, it says "On physical examination,

Page 162

his left hand wound is healed."

Do you see that?

A    No.

Q    Go down, same page.

A    Yes.

Q    Okay.  Do you see where you read "left hand trumps the left shoulder pain"?

A    Yes.

Q    Go down one, two, three lines, and there's a sentence that says:  "On Physical Examination"?

A    Okay.

Q    Do you see where it says, "On physical examination, his left hand wound is healed"?

A    I'm not sure what that means.

Q    But you -- I read it correctly; correct?

A    You read it correctly.

Q    All right.  And on the next page, 973, it states that -- do you see No. 1 where it says "The patient has degenerative disc disease in his cervical spine."

A    Yes.

Q    And No. 2, "He has left shoulder pain."

A    Yes.

Q    "This is related more to degenerative changes rather than any traumatic abnormality.

There's no rotator cuff tear and there is no true SLAP tear. It appears that he has some degenerative changes at the glenoid. I will review the actual MRI myself when it's brought to me hopefully tomorrow."

          Do you see that?

     A    I do see that.

     Q    And he doesn't recommend any further treatment; correct?

     A    Correct.

     Q    He stated that you have arthritis and may always have some arthritic pain in your shoulder; correct?

     A    Yeah. I didn't know that prior to that.

     Q    But you understand he states it here?

     A    Yes.

     Q    He opined that you're extremely functional and doing extremely well?

     A    I said that?

     Q    No. He concluded that?

     A    He concluded. Okay.

     Q    You see in the second paragraph --

     A    Second paragraph, yes.

     Q    -- under "Plan," the second line, it says, "However, at this time, he is extremely functional

doing extremely well in regards to the left shoulder"?

A    I don't see it.

Q    Do you want to point it to him?

A    Okay.  Okay.

Q    He states that there's no traumatic abnormality in your left shoulder from the accident; correct?

A    He states that; correct.

Q    And there are -- instead, those were degenerative changes; correct?

A    That's what he states, yes.

Q    And he concludes the accident didn't cause your problems; correct?

A    He states that, yes.

Q    Have you had someone else conclude otherwise?

A    Not on my shoulder.

Can I make a statement?

Q    Sure.

A    None of this had started until that accident.  I didn't have any trouble with my shoulder or my wrist before that accident.

Q    So you immediately got out of the car when you were hit from behind; correct?

Page 167

you're claiming for lost wages in this lawsuit?

A    Somewhere in the neighborhood of 200 hours.

Q    So I think we went over earlier your -- prior to the lawsuit, you suggested your lost wages was $2,500.

A    Okay.  That sounds right.

Q    Are you claiming more than that now?

A    No.

Q    What dates do you remember missing?

A    Oh, I could not tell you that right now.

Q    Were they immediately after the February --

A    It's been on and off nights with pain and no sleep.

Q    Did you take any vacation or sick leave?

A    Yeah.  I certainly did.

Q    Is that part of your hours or is that paid time off?

A    It's not.

Q    You would be paid for that; right?

A    Yeah.  I'm paid for sick leave, also.

Q    And when you made this move in 2014 to this apprentice position --

A    Yes.

Page 168

Q    -- was that at your choosing?

A    I'd say I had no choice.

Q    Because --

A    I had nowhere else -- it was either that or go back to the coal-fired plant, an old coal-fired plant that was -- I would have had to quit.  It was destroying my health, so I had no choice.

Q    So were there dates on which you were not paid in which you couldn't work?

A    There's no dates where I was not paid.

Q    So you were compensated?

A    Yes.  I have a sick leave policy.

Q    And you were ultimately cleared to return to work with no restrictions; right?

A    Correct.

Q    And you've been working since that time?

A    Yes.

(Exhibit 5 marked for identification)

BY MR. O'CONNOR:

Q    Let me hand you what's been marked as Exhibit 5.  What is this document?

A    Pardon me?

Q    What is this?

A    Looks like a timeline on the accident.

Page 172

A    I just couldn't.  I mean, I've got a bum hand and --

Q    Well, Safeco didn't cause the bum hand; right?

A    I know that.

Q    Safeco didn't cause any physical harm to you.

A    What's the purpose of having insurance; right?  I mean, I've been paying for 60 years minus 18, that many years --

Q    Explain that to me.

A    I've been paying insurance for many years.

Q    How long have you been paying --

A    42 years, I guess.

Q    How long have you been paying Safeco?

A    I'm not sure.

Q    You understand that an insured has to pay premiums for coverage; correct?

A    Uh-huh.

Q    And you understand that Safeco or an affiliate insured Mr. Koch who hit you; correct?

A    Correct.

Q    And on that claim, the entire policy limit was paid of $25,000; right?

A    Right.

Q    Do you know what your total medical bills were?

A    25,7.  27.

Q    You personally haven't been out of pocket any money; correct?

A    No.  Other than time.

Q    Anything else?

A    No.

Q    Did you ever make any kind of complaint with the Oklahoma Insurance Department?

A    No.

Q    Now, when I asked you what Safeco did wrong, you brought a claim for breach of contract and a claim for breach of the duty of -- the implied duty of good faith and fair dealing.  Have you told me what you believe supports those claims?

A    I think so.

Q    Have you seen anybody for any kind of, like, psychiatrist, counselor, therapist for anything that relates to this accident?

A    I have not.

Q    Or relates to any conduct of Safeco?

A    No.

Q    And you said earlier that you had a future pain and suffering?

Page 174

A    It looks like it.

Q    Because of what?

A    The doctors can't diagnose what's wrong with me.

Q    With respect to?

A    My wrist.

Q    Anything else?

A    No.

Q    We've gone over a couple workers' comp claims, one's pending and one was resolved for -- how much?  $14,000?

A    $13,000.

Q    $13,000?

A    13 or 14, yeah.

Q    Have you received any other compensation from the government such as social security, disability, or --

A    No.

Q    No?  Have you applied for any of that?

A    No, I haven't.

Q    And we covered the only workers' compensation claims that you've brought?

A    Yes.

Q    And you would acknowledge that there's a dispute between you and Safeco as to the amount of

Page 175

any uninsured motorist benefits owed; correct?

A    Correct.

Q    And you've assigned one value to the claim and Safeco assigns another; correct?

A    Correct.

Q    And two people can certainly disagree or reach different conclusions as to the value of a claim; right?

A    Right.

Q    And two people could reasonably differ on the source of injuries; correct?

A    Yes.

MR. O'CONNOR:  I don't have anything further.

MS. WANDRES:  I have nothing further. We'll read and sign.

THE VIDEOGRAPHER:  This concludes the video deposition of James Perry.

We are off the record at 2:53.

Page 178

CERTIFICATE

I, Becky Dame, Certified Shorthand Reporter, do hereby certify that the above-named JAMES ROBERT PERRY, JR., was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, in the case aforesaid; that the above and foregoing deposition was by me taken in shorthand and thereafter transcribed; and that I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 4th day of April, 2019.

_Becky C Dame_

_____

Becky Dame, CSR, RPR